IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2020

## ZACHARY J. PENCE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Anderson County**
No. B6C00266     Donald Ray Elledge, Judge

_____

### No. E2019-01942-CCA-R3-PC
_____

The Petitioner, Zachary Pence, was convicted of aggravated rape of a child, aggravated child abuse, and child abuse.[1] See Tenn. Code Ann. §§ 39-13-531, -15-401, -15-402. He was subsequently sentenced to sixty years. Following denial of his direct appeal, the Petitioner filed a petition seeking post-conviction relief, alleging that trial counsel was ineffective based on the following grounds: (1) failing to prepare for trial and to prepare the Petitioner to testify at trial; (2) failing to investigate; and (3) failing to provide the Petitioner with audio recordings until the day prior to trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Brennan Patrick Lenihan, Oak Ridge, Tennessee, for the appellant, Zachary J. Pence.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; David S. Clark, District Attorney General; and Victoria Bannach, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### TRIAL

_____

[1] The child abuse conviction was classified as a D felony because the victim was under six years of age.

Following a jury trial, the Petitioner was convicted of one count each of aggravated rape of a child, aggravated child abuse, and child abuse. He was sentenced to concurrent terms of sixty years for the aggravated rape of a child conviction, twenty-five years for the aggravated child abuse conviction, and two years for the child abuse conviction. See State v. Zachary James Pence, No. E2015-00476-CCA-R3-CD, 2016 WL 692740, at *1 (Tenn. Crim. App. Feb. 22, 2016).

At trial, the mother of the two victims, A.F. and B.F., testified that she began a romantic relationship with the Petitioner near the end of 2008 and that the two began living together around February 2009. Pence, 2016 WL 692740, at *1. At this time, A.F. was three years old and B.F. was eighteen months old. Id. That same year, the victims' mother worked the day shift at a convenience store. Id. On July 18, 2009, the victims' mother did not recall the children having any injuries when she put them to bed. Id. On July 19, 2009, the victims' mother left the children in the care of the Petitioner. Id.

The same day, around 10:30 a.m., the Petitioner called the victims' mother to inform her that the children were awake, and she later called to check on the children. Pence, 2016 WL 692740, at *1. A.F. cried to her mother and asked that she come home. Id. After this call, the victims' mother contacted the Petitioner's mother, Ms. Miller, and asked her to visit the children. Id. Ms. Miller informed the victims' mother that she needed to take A.F. to the hospital because she looked "extremely sick" and had a puffy face and lips. Id.

The Petitioner told the victims' mother that he thought A.F. may have been having an allergic reaction. Pence, 2016 WL 692740, at *1. Upon arriving home, the victims' mother observed that both children had swollen lips. Pence, 2016 WL 692740, at *2. The victims' mother contacted Ms. Miller for transportation to take the children to the hospital. Id. While waiting, A.F. was changing clothes and stated that her "pee-pee hurt." Id. Additionally, while changing B.F.'s diaper, the victims' mother noticed a "break in the skin" on his rear thigh near his buttocks. Id. The victims' mother also noticed a bruise on the back of A.F.'s thigh and that a corner of her eye was "red, almost bloodshot." Id.

After arriving at the hospital, the physician spoke alone with A.F. Pence, 2016 WL 692740, at *2. While A.F. provided a urine sample, the victims' mother observed dried blood spots in A.F.'s underwear. Id. The victims' mother informed the nurses that the bruises on A.F. were not present when she left for work that morning, and she reported the dried blood. Id. She also reported that the Petitioner had cared for the children while she was at work that day. Id. A.F. also spoke alone with a detective and with Sarah Powell from Child Protective Services (CPS). Id. The victims' mother reported to Ms. Powell that the Petitioner had been alone with the children. Id. The children were sent to live temporarily with their maternal great-grandmother. Id. The victims' mother sent the

Petitioner text messages while at the hospital suggesting he come to the hospital to talk about what occurred that day. Id. at *3. The Petitioner arrived about an hour later. Id.

The victims' mother left the hospital and did not spend the night with the Petitioner. Pence, 2016 WL 692740, at *3. The next morning, she went to the sheriff's office to speak with the investigating detective. Id. The Petitioner accompanied her after telling her that he had spanked A.F. with a belt and that he had touched her buttocks, but not "in a sexual way." Id. The Petitioner also told her that "it was like [he] blacked out" and that A.F. was "being bad and not listening." Id. Upon arriving at the sheriff's office, the victims' mother reported the admissions from the Petitioner. Id.

The victims' mother stated that she initially believed that the Petitioner was not capable of abusing a child. However, at that time, she had not seen all of the evidence and had not spoken to A.F. about the incident. Pence, 2016 WL 692740, at *4.

At the time of the trial, the victims' mother did not have custody of the children. Pence, 2016 WL 692740, at *4. She had written the Petitioner after his arrest. Id. She testified that she was initially concerned about a neighbor that possibly had a child molestation conviction. Id. The neighbor had been in her house and had given A.F. gifts. Id. She had also been concerned about some fingerprints outside of A.F.'s windows. Id.

A.F. testified that at the time of trial she was six years old, and she identified an anatomical drawing of a female and identified the buttocks and vaginal area as areas for "bad touches." Pence, 2016 WL 692740, at *5. She did not want to testify about bad touches because she was scared. Id.

Ms. Miller testified that she vaguely remembered the Petitioner's relationship with the victims' mother. She did not recall taking the children to the hospital on July 19, 2009. Pence, 2016 WL 692740, at *5.

Ms. Powell testified that she conducted a forensic interview with A.F. and that A.F. identified the Petitioner as the person who hurt her. Pence, 2016 WL 692740, at *5. Her interview lasted about ten minutes. Id. She also examined B.F. and noted "red dots, petechial or something" on his face and a red mark on his side. Id.

Ms. Powell talked to the Petitioner, and he understood that she was investigating A.F's facial swelling. Pence, 2016 WL 692740, at *5. The Petitioner said that he was aware A.F. had a vaginal tear but that he did not know what had caused it. Id. Ms. Powell told the Petitioner that he needed to be honest and that a limited number of people could have caused the tear. Id. She said the Petitioner responded, "[W]hat happens if I did, will I go to jail?" Id. Ms. Powell told the Petitioner that she was only there to learn what

happened. Id. The Petitioner told her, "[L]et's just say I did it." Id. She asked the Petitioner if he caused the injury, and he answered in the affirmative. Id.

Ms. Powell testified that the Petitioner said he used his left pointer finger and bent it back and forth when asked to describe what he had done to A.F. Pence, 2016 WL 692740, at *5. He attempted to give a measurement on his finger indicating how far he thought his finger had entered A.F.'s vagina. Id. When Ms. Powell asked the Petitioner what he was thinking, he told her that he was "just curious." Id. The Petitioner also admitted to spanking A.F. with a belt and a fly swatter. Id. at *6.

Ms. Powell testified that the victims' mother was not permitted to have any contact with the children because she failed to protect them. Pence, 2016 WL 692740, at *6. At the time of the interview, the victims' mother did not believe the Petitioner had caused the injuries. Id.

Clinton Police Detective Danielle Alexander testified that she responded to the children's hospital on July 19, 2009, and she took photographs of the children's injuries. Pence, 2016 WL 692740, at *6. She interviewed the Petitioner the next day at the police station, and this interview was audio recorded. Id. She had activated the recording after the Petitioner had agreed to speak with her. Id. at *7. In the interview, the Petitioner admitted "whooping" A.F. Id. at *6. The Petitioner also admitted inserting his index finger into A.F's vagina and described moving his finger. Id. The Petitioner stated that it had only lasted for two seconds before he realized it was improper and left A.F.'s room. Id. The Petitioner asked what would happen to him and said that his biggest fear was going to jail. Id.

Dr. Dante Pappano, a pediatric emergency medicine and child abuse expert, testified that he treated the children at the children's hospital emergency room on July 19, 2009. Pence, 2016 WL 692740, at *7. Dr. Pappano described the bruising on B.F. Id. He also described A.F.'s injuries, including two one-millimeter tears along the posterior portion of her hymen, and he noted dried blood in her underwear. Id. Dr. Pappano testified that A.F. disclosed that the Petitioner "hit" her and that she shook her head affirmatively when asked if the Petitioner hurt her "pee-pee." Id.

The children's father testified that the children lived with their mother on the day of the incident and that within a year of the incident, the children began living with him. Pence, 2016 WL 692740, at *8. A.F. had attended counseling for one and one-half years succeeding the event on July 19, 2009. Id. A.F. had nightmares and did not sleep well. Id.

-4-

The Petitioner was convicted of aggravated rape of a child, aggravated child abuse, and child abuse. On direct appeal, the Petitioner claimed that: (1) the evidence was insufficient to support his convictions; (2) the trial court erroneously permitted inadmissible hearsay; (3) the trial court improperly commented on the evidence; (4) the trial court permitted improper opinion testimony; (5) the trial court improperly instructed the jury; (6) his sentence for the aggravated rape of a child conviction was excessive; and (7) the cumulative effect of those errors entitled him to relief. Pence, 2016 WL 692740, at *1.

This court concluded that the evidence was sufficient to convict the Petitioner of aggravated child rape. Pence, 2016 WL 692740, at *9. The court noted that the Petitioner did not dispute that he penetrated A.F. and that the expert medical testimony reflected that A.F.'s hymen was torn twice because of the Petitioner's conduct. Id. Additionally, this court concluded that the evidence was sufficient to convict the Petitioner of aggravated child abuse. Id. at *10. The court concluded that A.F.'s injuries and the photographs of her bruises were sufficient to convict the Petitioner. Id.

This court concluded that the trial court properly allowed testimony from the victims' mother regarding why she returned home from work on the day of the incident and her responses to the nurse's questions at the hospital. Pence, 2016 WL 692740, at *11. The court did not find any improper comments on the evidence by the trial court. Id. at *12.

The court concluded that the Petitioner failed to argue that additional jury instructions were warranted and had waived the issue. Pence, 2016 WL 692740, at *15. Additionally, the court concluded that the sentence for aggravated rape of a child was not excessive and the sentencing court had properly applied enhancement factors and the Petitioner had received a within-range sentence. Id. at *21.

Finding that the evidence was sufficient and no cumulative error existed, this court affirmed the judgments of the trial court. Pence, 2016 WL 692740, at *22

### POST-CONVICTION HEARING

The Petitioner filed a pro se petition seeking post-conviction relief on July 1, 2016, alleging that he was denied effective assistance by trial counsel. Following the appointment of post-conviction counsel, an amended petition was filed on February 25, 2016. The Petitioner specifically alleged that he received ineffective assistance in the following ways: (1) trial counsel failed to prepare for trial and to prepare the Petitioner to testify at trial; (2) trial counsel failed to investigate; and (3) trial counsel failed to provide

-5-

the Petitioner with audio recordings until the day prior to trial. The post-conviction court held an evidentiary hearing on July 30, 2019.

At the post-conviction hearing, the Petitioner testified that he was arrested on August 6, 2009, and charged with aggravated rape of a child, aggravated child abuse, and child abuse. The Petitioner's grandfather had retained trial counsel on his behalf. Trial counsel first visited the Petitioner about a month after his arrest. The Petitioner was unsure how many times he met with trial counsel but stated that "[trial counsel] would only come to see [him] the day prior to court[.]" The Petitioner said that during these meetings, trial counsel "would explain [] what was going to happen in court and that was the extent of the conversation."

The Petitioner was released on bond on August 11, 2011, and went to reside with his grandfather in Kentucky. The Petitioner testified that trial counsel had been "informed that [the Petitioner] was out." During this time, the Petitioner would only meet with trial counsel when he would travel to Tennessee for court dates. The Petitioner testified that he would "try to call and set up a meeting, [but trial counsel] would inform [him] that [trial counsel] had other clients to deal [with] and it wasn't the time to meet[.]" The Petitioner tried to meet with trial counsel on other occasions, but trial counsel said "that he was busy at the time."

The Petitioner testified that his trial date was in June 2012 and that prior to trial, he had only received one plea offer before he was released on bond in August 2011. The Petitioner did not recall any subsequent discussions regarding a plea offer.

The Petitioner testified that trial counsel explained that he was trying to suppress some evidence at a suppression hearing, but according to the Petitioner, no preparation had occurred prior to the hearing. Additionally, the Petitioner contended that trial counsel did not prepare for trial.

The Petitioner graduated high school with a "special education diploma." The Petitioner had "trouble reading and understanding what [he] read." The Petitioner recalled having a "Ridgeview" mental evaluation while he was released on bond, but he could not recall the evaluation's purpose. He only recalled being asked questions. The Petitioner testified that before his trial date, trial counsel had threatened to "get off [the Petitioner's] case" if he was not paid his fee in full. The Petitioner believed trial counsel had already been paid in full.

The Petitioner testified that he met with trial counsel at his office the day before trial. The Petitioner tried to fire trial counsel at this meeting, but trial counsel "informed [him] that [he was] not allowed to fire him because" the trial was too close. The Petitioner

-6-

testified that during this meeting, trial counsel presented an audio recording that trial counsel had acquired from the State. The recording was of the Petitioner's interview with Detective Alexander. The Petitioner asserted that he had not heard the audio recording previously.

The Petitioner testified that trial counsel poorly prepared for trial. The Petitioner gave trial counsel letters from the victims' mother that stated "she [knew] who did this and that she was behind [the Petitioner] a hundred percent[.]" Trial counsel hired a private investigator, which the Petitioner met with one time. The Petitioner did not think the private investigator spoke to anyone he had discussed with trial counsel.

On cross-examination, the Petitioner testified that he had been presented with a plea offer of twenty-five years to be served at eighty-five percent. The Petitioner averred that he and trial counsel spoke about the offer twice and that trial counsel advised him not to accept the plea offer. The Petitioner did not testify at trial. The Petitioner could not recall the defense strategy at trial, or whether counsel argued that the Petitioner was innocent.

The Petitioner did not recall hearing the audio recording, but he did recall a suppression hearing two months before the trial. The Petitioner testified at the suppression hearing, and he remembered the audio recording's having been played at the hearing.

Additionally, the Petitioner did not recall missing meetings that had been scheduled with trial counsel. The Petitioner did not recall calling trial counsel to set up meetings, he only recalled his grandfather's calling on his behalf. He did not remember trial counsel's meeting with his sister. He guessed that he met with trial counsel "fifteen or sixteen times" while he was incarcerated. After he was released on bond, the Petitioner met with trial counsel about once a month before each court hearing, and he noted that he was "out [for] ten months." He also met at trial counsel's office the day before trial.

The Petitioner recalled the victims' mother testifying at trial. At the time she wrote the letters to the Petitioner, the two were still romantically involved. However, at the time of trial, the two were no longer romantically involved, and she did not testify that she believed someone other than the Petitioner committed these crimes.

On redirect examination, the Petitioner testified that during his meetings with trial counsel, trial counsel briefly told him when his next court date was, but that they would not discuss his case or charges. Trial counsel did not review the Petitioner's file with him. The Petitioner stated that his grandfather provided his transportation to meetings and court dates and that his grandfather had a better understanding of what was happening.

Trial counsel testified that he did not recall who had retained him, but that he gathered copies of the Petitioner's paperwork and filed discovery motions quickly. He met with the Petitioner "a number of times" at the jail. During these meetings, trial counsel explained the nature of the charges, the minimum and maximum sentences, and what had happened during the suppression hearing.

The Petitioner had given trial counsel permission to speak with the Petitioner's mother about his case. He noted that she "was the type that would probably call on a daily basis." He also recalled meeting with the Petitioner's sister on a number of occasions.

Trial counsel testified that he sent the Petitioner for a psychiatric evaluation. The results of the evaluation indicated that the Petitioner knew the difference between right and wrong, that he was competent to stand trial, and that he would be able to assist counsel in preparation for trial, but that he may require "a little bit more time" with counsel. Trial counsel "made sure [he] explained everything fully to [the Petitioner] where [the Petitioner] would always say [that the Petitioner] understood."

Trial counsel spoke with the victims' mother on "a number of occasions." He recalled the "love letters" between the victims' mother and the Petitioner. The victims' mother indicated in the letters that the Petitioner was not guilty and that some "mystery person" may have climbed in a window and committed these crimes. Based on these letters, trial counsel hired a private investigator. Trial counsel recalled the investigator's visiting the trailer park where the victims and the victims' mother lived and interviewing residents about a possible unknown alternate perpetrator. The investigator did not find any such evidence. Trial counsel testified that at the time of trial, the victims' mother believed the Petitioner was guilty.

Trial counsel reviewed discovery with the Petitioner on a number of occasions. Similarly, they reviewed the plea offer a "multitude" of times. Trial counsel advised the Petitioner to accept the plea offer, but the Petitioner refused.

Trial counsel could not recall meeting with the Petitioner the day before trial, but he did recall the Petitioner's missing scheduled meetings or showing up one to two hours late. Trial counsel did not believe that the Petitioner or his grandfather ever tried to fire him or that they felt he was unprepared for trial. Trial counsel recalled Detective Danielle Alexander's testifying at the suppression hearing that the Petitioner acknowledged that he penetrated the victim.

On cross-examination, trial counsel testified that he had been practicing law for approximately twenty-five years. He had represented between "three and five thousand" criminal defendants. Trial counsel was retained by the Petitioner's grandfather and had

been paid his full fee at the beginning of the representation. He filed a motion to withdraw after the trial concluded.

Trial counsel recalled "a minimum of half a dozen" appointments that the Petitioner failed to attend. Additionally, trial counsel testified that the Petitioner was late to another "half dozen" appointments. Trial counsel managed to meet with the Petitioner between "six to ten" times after he was released on bond and before trial.

Trial counsel testified that the discovery in this case was of a typical nature and included a victim's statement, a statement from the Department of Children's Service worker, a detective's statement, and a doctor's report. Trial counsel also recalled a statement from the Petitioner that was very damaging. Trial counsel filed a motion to suppress the statement; however, after a hearing, the statement was deemed to be voluntary and admissible. Trial counsel testified that he felt prepared for trial. He recalled cross-examining all of the witnesses at the two-day trial.

Rhiannon York testified that she was trial counsel's secretary for seven years and recalled trial counsel's representation of the Petitioner. At trial counsel's office, Ms. York would answer telephone calls, contact clients to schedule meetings, and call clients to remind them about court dates. Ms. York recalled that it was hard to reach the Petitioner via telephone and that his family members would usually answer her calls. She recalled the Petitioner's visiting trial counsel's office one time and also recalled the Petitioner's not showing up for at least one scheduled meeting.

The post-conviction court concluded that trial counsel was not ineffective. Relative to the Petitioner's argument that trial counsel failed to prepare for trial and to prepare the Petitioner to testify at trial, the court noted that the Petitioner did not testify at trial and that trial counsel "did everything he could do in preparation for this trial." In regards to the claim that trial counsel failed to investigate, the court concluded that trial counsel hired an investigator and that the investigator found no evidence of a "phantom perpetrator." Finally, the court noted that trial counsel did not fail to provide the Petitioner with audio recordings until the day before his trial, but that a hearing to suppress the audio recordings of the Petitioner's confession had been heard some two months before the trial. The court denied the post-conviction petition by written order filed on September 30, 2019.

The Petitioner timely filed a notice of appeal. The case is now before us for review.

**ANALYSIS**

On appeal, the Petitioner maintains his ineffective assistance of counsel claims. Specifically, he raises the following allegations: (1) failure to prepare for trial and to

prepare the Petitioner to testify at trial; (2) failure to investigate; and (3) failure to provide the Petitioner with audio recordings until the day prior to trial. The State responds that the Petitioner failed to establish that trial counsel was ineffective.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854,

869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. State v. Black, 794 S.W.2d 752 at 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of petitioner.

Id. Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called." Id. at 758.

### I.    Failure to Prepare for Trial and to Prepare the Petitioner to Testify

We agree with the post-conviction court that counsel was not deficient in his trial preparation. Counsel and the Petitioner both testified that they met numerous times at the jail and after the Petitioner was released on bond. In addition to his meeting with the Petitioner, counsel hired an investigator to interview witnesses and seek information about a possible third-party perpetrator. Further, counsel filed discovery motions and attempted unsuccessfully to have the Petitioner's confession suppressed. The Petitioner does not specify what further preparation should have been undertaken or how such preparation would have yielded a more favorable result. We note that the evidence of the Petitioner's guilt at trial was overwhelming. The record supports the post-conviction court's finding that counsel was not deficient and that the Petitioner was not prejudiced.

Relative to the trial counsel's alleged failure to prepare the Petitioner to testify, the record is devoid of any evidence regarding counsel's discussions with the Petitioner on this subject. Neither the Petitioner nor trial counsel were questioned at the post-conviction hearing about preparation to testify, or lack thereof. The post-conviction court made no other findings than that the Petitioner did not testify at trial. The Petitioner failed to establish his factual allegations by clear and convincing evidence.

### II.    Failure to Investigate

We agree with the post-conviction court that counsel was not deficient in his investigation. Counsel and the Petitioner testified that trial counsel hired a private investigator. The private investigator conducted interviews with neighborhood residents in an attempt to find an unknown perpetrator, but the investigator did not uncover any such evidence. Trial counsel also spoke with the victims' mother on multiple occasions at the behest of the Petitioner. He recalled the "love letters" between the victims' mother and the Petitioner, but at the time of trial, the victims' mother believed the Petitioner was guilty. The Petitioner did not offer other evidence or other witnesses that trial counsel should have investigated. The record supports the post-conviction court's findings that counsel's investigation was not deficient.

### III.    *Failure to Provide Audio Recordings*

We agree with the post-conviction court that trial counsel was not deficient in his failure to provide audio recordings. Trial counsel testified that he reviewed the discovery with the Petitioner a "multitude" of times. Additionally, trial counsel attempted to have the audio recording of the Petitioner's confession suppressed two months before the trial. Counsel and the Petitioner testified that the audio recording was played at the suppression hearing, where the Petitioner was present. The record supports the post-conviction court's finding that counsel was not deficient and that the Petitioner was not prejudiced.

### CONCLUSION

Based upon the foregoing and the record as a whole, the judgement of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE