18

## CIRCUIT COURT OF THE CITY OF ROANOKE

Davey James Reedy

 v.

E. E. Wright,
Warden of the
Brunswick Correctional Center

April 8, 2002

Case No. CL00000-23

By Judge Clifford R. Weckstein

In 1988, Davey James Reedy was convicted of the arson-murders of his four-year-old daughter and two-year-old son and of arson of the home in which they were sleeping. His convictions were affirmed. More than eleven and a half years later, he filed a petition for writ of *coram nobis* and, six months later, a petition for writ of *habeas corpus*. In these collateral attacks on his convictions, he asks that the state be ordered to retry or free him.

These are the issues in this case.

The *habeas corpus* petition is barred by the statute of limitations. Does Reedy's claim of actual innocence permit him to evade that bar? What is his burden on this issue, and has he met it?

Does his claim of innocence entitle him to relief? Can he obtain relief through his petition for *coram nobis*, whether or not his *habeas* claim is time-barred?

If he can maintain this action, is he entitled to relief based upon his competency claims?

These are the claims: that this court tried or sentenced him when he was not competent to be tried; and that his retained lawyer inadequately represented him by failing to seek a formal pretrial competency finding or in-trial competency hearing; failing to assure that the psychologist who conducted a court-ordered pretrial competency evaluation considered records of a psychiatrist who had treated Reedy before trial and of a social worker who assisted the psychiatrist; and failing to assert incompetence at the sentencing hearing.

This opinion letter contains the court's findings of facts and conclusions of law. The record of the underlying criminal case is incorporated in the record of this case.

### *History of the Case*

Reedy was indicted for arson and for capital murder, willful, deliberate, and premeditated murder of his daughter Tina Marie and his son Michael as part of the same act or transaction. Tried on those charges, he was convicted, on February 10, 1988, of the felony murder of each child and of arson. On March 16, 1988, I confirmed the verdicts and imposed the sentences fixed by the jury. The Court of Appeals, which affirmed the trial court's judgment on February 6, 1990, *Reedy v. Commonwealth*, 9 Va. App. 386, 388 S.E.2d 650 (1990), denied rehearing *en banc* on March 5, 1990 (Record No. 0479-88-3). On June 30, 1990, the Supreme Court declined to review the case. It denied Reedy's petition for rehearing on September 21, 1990 (Record No. 900418).

On December 27, 1999, Reedy filed *pro se* a petition for writ of *coram nobis*. The warden, represented by Assistant Attorney General Marla Graff Decker, who had represented the Commonwealth in Reedy's direct appeal, filed a motion to dismiss. Other motions were filed between then and June 16, 2000, when, now represented by attorney Roberta A. Bondurant, Reedy filed in the same suit a petition for writ of *habeas corpus*. The Attorney General again moved to dismiss. On September 20, 2000, I granted Reedy's request for evidentiary hearing, reserving judgment on all of the parties' motions. The *habeas* petition was amended on December 5, 2000. Reedy seeks any collateral relief to which he is entitled, whether through *coram nobis* or *habeas corpus*. At every stage of the case, the warden has contended that Reedy's petitions and amendments are procedurally barred and factually meritless.

The parties presented evidence for some fourteen hours January 5, 2001, and for most of a day on January 18, 2001. After filing briefs, counsel made closing arguments on April 9, 2001. Neither Reedy nor his family could afford to hire an attorney to represent him in this case. Ms. Bondurant selflessly, in one of the noblest traditions of the legal profession, volunteered her services. Once I agreed to hold a plenary hearing, I appointed her to represent the petitioner.

*The Habeas Claim is Time-Barred*

A decade after Reedy's conviction, the General Assembly enacted a statute of limitations for *habeas corpus* cases.

> A petition for writ of *habeas corpus ad subjiciendum*, other than a petition challenging a criminal conviction or sentence, shall be brought within one year after the cause of action accrues. A *habeas corpus* petition attacking a criminal conviction or sentence, except as provided in § 8.01-654.1 for cases in which a death sentence has been imposed, shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later.

Va. Code § 8.01-654(A)(2) (effective July 1, 1998).

The parties had argued about how the new statute affected those who, like Reedy, were in prison when the law took effect. *Haas v. Lee, Warden*, 263 Va. 273, 560 S.E.2d 256 (2002), settled those arguments.

To be constitutional, a state statute that limits or extinguishes an existing right to sue must allow "a reasonable time ... for the commencement of suits upon existing causes of action." *Texaco, Inc. v. Short*, 454 U.S. 516, 527, 70 L. Ed. 2d 738, 102 S. Ct. 781, n. 21 (1982); *see Brown v. Angelone*, 150 F.3d 370 (4th Cir. 1998). Calling upon principles of law and equity and upon linguistic analysis conducted by (among others) English teachers and a professional writer with a Master's Degree, Reedy argued that, at a minimum, two years was a "reasonable time" for him to file after the effective date of Code § 8.01-654(A)(2). His *pro se coram nobis* petition and his counseled *habeas corpus* petition were filed more than one year, but fewer than two years, after July 1, 1998. *Haas v. Lee* settled the question: Reedy's "reasonable time" within which to file a *habeas* petition expired on July 1, 1999, one year after § 8.01-654(A)(2) was adopted.

Reedy suggested that a procedural bar which precludes him from ever challenging the legality of his confinement might be constitutionally infirm. The U.S. Supreme Court recently answered similar arguments:

> Our system affords a defendant convicted in state court numerous opportunities to challenge the constitutionality of his conviction. ... These vehicles for review, however, are not available indefinitely and without limitation. Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim. *See, e.g., United States v. Olano*, 507 U.S. 725, 731, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993) ("No procedural principle is more familiar to this Court than that a constitutional right ... may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (*quoting Yakus v. United States*, 321 U.S. 414, 444, 88 L. Ed. 834, 64 S. Ct. 660, 28 Ohio Op. 220 (1944))). One of the principles vindicated by these limitations is a "presumption deeply rooted in our jurisprudence: the 'presumption of regularity' that attaches to final judgments, even when the question is waiver of constitutional rights." *Parke* [*v. Raley*, 506 U.S. 20, 121 L. Ed. 2d 391, 113 S. Ct. 517 (1992)], *supra*, at 29.

*Daniels v. United States*, 532 U.S. 374, 381 149 L. Ed. 2d 590, 121 S. Ct. 1578 (2001); *see Lackawanna County District Attorney v. Coss*, 532 U.S. 394, 402-04, 149 L. Ed. 2d 608, 121 S. Ct. 1567 (2001). Since Reedy failed to

22

file within one year of the date that § 8.01-654(A)(2) took effect, his *habeas* claim is barred, unless the law allows him to bypass this statute of limitations.

## Two Common Law Writs

"It is routine for courts to construe prisoner petitions without regard to labeling in determining what, if any, relief the particular petitioner is entitled to." *Chambers v. United States*, 106 F.3d 472, 475 (2d Cir. 1977). In this case, however, because, unlike *habeas corpus, coram nobis* (also known as *coram vobis*) is not affected by a statute of limitations, I must discuss distinctions between these two "ancient writ[s] of the common law." *Dobie v. Commonwealth*, 198 Va. 762, 768-70, 96 S.E.2d 747 (1957).[1] There has been "a wide difference of opinion in both state and federal courts" about "whether *coram nobis* can provide a remedy when *habeas corpus* is not available under the circumstances of a particular case." *Blowe v. Peyton*, 208 Va. 68, 73-74, 155 S.E.2d 351 (1967). Under Virginia law, the answer to "whether a motion for a writ of error *coram vobis* may be substituted for a petition for a writ of *habeas corpus*" is no. "It does not supplant the writ of *habeas corpus.*" *Id.*

*Habeas* has been "known through the centuries as 'The Great Writ'," *Hawks v. Cox*, 211 Va. 91, 92, 175 S.E.2d 271 (1970). "Considered by the Founders as the highest safeguard of liberty, it was written into the Constitution of the United States," Art. I, § 9, and the Virginia Declaration of Rights, Constitution of Virginia, Article 1, § 9. *Smith v. Bennett*, 365 U.S. 708, 712, 6 L. Ed. 2d 39, 81 S. Ct. 895 (1961). "*Habeas corpus* is a writ of inquiry granted to determine whether a person 'is detained without lawful authority'." *Blowe v. Peyton*, 208 Va. at 73. *Coram nobis*, rather than challenging the lawfulness of custody, "was traditionally available only to bring before the court factual errors 'material to the validity and regularity of the legal proceeding itself,' such as the defendant's being under age or having died before the verdict." *Carlisle v. United States*, 517 U.S. 416, 429, 134 L. Ed. 2d 613, 116 S. Ct. 1460 (1996). While this writ gave a trial court "an opportunity to correct its own record with reference to a vital fact not known when the judgment was rendered" which might, if known, have deprived the court of power to enter the judgment, it could not be used to correct an error in

---

[1] In sixteenth century England, when the writ originated, it was called *coram nobis* ("before us") in the Court of the King's Bench, and coram *vobis* ("before you") in the Court of Common Pleas. There was no practical distinction between the two writs then, and the terms are, effectively, interchangeable in twenty-first century America. *See* 18 Am. Jur. 2d, *Coram Nobis and Allied Statutory Remedies*, § 1.

the judgment of the court, nor "to contradict or put in issue a fact directly passed upon and affirmed in the judgment itself." *Dobie*, 198 Va. at 768-70.

Today in Virginia, "we have by statute provided for a proceeding by motion to correct 'any clerical error or error in fact for which a judgment or decree may be reversed or corrected,' as a substitute for the common law writ of error *coram vobis*, sometimes called *coram nobis*." *Blowe v. Peyton*, 208 Va. at 73-74.[2] The relief available through *coram nobis* is coextensive with, and identical to, that provided by Code § 8.01-677. *Coram nobis* in Virginia law is solely "a mechanism for correcting 'clerical errors or errors in fact'." *United States v. Gaylor*, 828 F. 2d 253, 256 (4th Cir. 1987). The only time a court can correct "errors in fact" through *coram nobis* is when those errors, if known in time by the court, would have prevented it from entering judgment. Such "errors in fact" do not include "newly-discovered evidence, newly-arising facts, or facts adjudicated on the trial" nor facts "known before or at the trial." *Dobie*, 198 Va. at 768-70; *also see Kibert v. Commonwealth*, 216 Va. 660, 222 S.E.2d 790 (1976).

There is, to be sure, another, and more elastic, view of *coram nobis*; cases are decided from time to time which hold that, when no other form of judicial relief is available to a prisoner who is actually innocent, *coram nobis* will fill the gap. *See, e.g., El-Tabech v. State*, 259 Neb. 509, 524-25, 610 N.W.2d 737, 747-48 (2000), and the Nebraska Supreme Court's lengthy discussion in *Carlson v. State*, 129 Neb. 84, 261 N.W. 339 (1935); *United States v. Ransom*, 985 F. Supp. 1017, 1019 (D. Kans. 1997) ("If defendant is innocent of he crime of which he was convicted and does not have any other effective opportunity to raise this claim, then there is a compelling reason to grant relief pursuant to a writ of *coram nobis*."). It also is worthy of note that, whenever the Supreme Court of Virginia has issued a published opinion in a case in which a person convicted of a crime sought *coram nobis*, the Court has discussed the facts of the case, notwithstanding a holding that the writ is

---

[2] That statute, Va. Code § 8-485, is now, after recodification and immaterial change, Va. Code § 8.01-677: "For any clerical error or error in fact for which a judgment may be reversed or corrected on writ of error *coram vobis*, the same may be reversed or corrected on motion, after reasonable notice, by the court." (*See also* Va. Code § 8.01-428(B): "Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order. During the pendency of an appeal, such mistakes may be corrected before the appeal is docketed in the appellate court, and thereafter as the appeal is pending such mistakes may be corrected with leave of the appellate court.")

24

inapposite. I return to these points in my discussion of Reedy's competency-related claims.

## Actual Innocence

I. The centerpiece of Reedy's pleadings and arguments is his assertion of innocence.

An exhibit filed with his petitions — and the first thing that his lawyer mentioned in her closing argument — is a lengthy story published in *The Roanoke Times* on Sunday, March 28, 1999. In inch-tall (72-point) boldfaced type, the headline asked, "Did Reedy really do it?" The story and a subheadline stated that, in the eleven years since his convictions, Reedy had never wavered in his claim that he is innocent. According to the story, Reedy and others asserted that there is evidence which proves that Reedy's former wife set the fire that killed the couple's children — including her own admissions.

The "proposition that the Constitution prohibits the imprisonment of one who is innocent of the crime for which he was convicted" has "an elemental appeal," Chief Justice Rehnquist has written. "After all, the central purpose of any system of criminal justice is to convict the guilty and free the innocent." *Herrera v. Collins*, 506 U.S. 390, 398, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

> Indeed, concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 25 L. Ed. 2d 368, 90 S. Ct. 1068, 51 Ohio Op. 2d 323 (1970) (Harlan, J., concurring).

*Schlup v. Delo*, 513 U.S. 298, 325, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995). *Bousley v. United States*, 523 U.S. 614, 620, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998). *But see* Givelber, "Meaningless Acquittals, Meaningful Convictions: Do We Reliably Acquit the Innocent?" 49 Rutgers L. Rev. 1317 (1997).

However, "freestanding claims of actual innocence" have never been a basis for *habeas* relief. *Herrera v. Collins*, 506 U.S. 390 at 404-05. Once a person has been "tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants," *Id.* at 419

(O'Connor, J., concurring), then to allow typical *habeas* relief, "a conditional order releasing him unless the State elects to retry him … would in effect require a new trial … years after the first trial, not because of any constitutional violation at the first trial, but simply because of a belief that in light of his new found evidence a jury might find him not guilty at a second trial. Yet there is no guarantee that the guilt or innocence determination would be any more exact. To the contrary, the passage of time only diminishes the reliability of criminal adjudications." *Id.* at 403 (opinion of the Court). *See Department of Corrections v. Crowley*, 227 Va. 254, 263, 316 S.E.2d 439 (1984); *Smyth v. Holland*, 199 Va. 92, 97, 97 S.E.2d 745 (1957), *cert. denied sub nom. Holland v. Smyth*, 357 U.S. 944, 78 S. Ct. 1394, 2 L. Ed. 2d 1556(1958); *Gross v. Smyth*, 182 Va. 724, 727, 30 S.E.2d 570 (1944); *Fitzgerald v. Bass*, 6 Va. App. 38, 46, 366 S.E.2d 615 (1988) (*en banc*), *cert. denied sub nom. Fitzgerald v. Thompson*, 493 U.S. 945, 110 S. Ct. 354, 107 L. Ed. 2d 342 (1989) ("As stated in *Lacey v. Palmer*, 93 Va. 159, 163, 24 S.E. 930, 931 (1896): 'The office of the writ of *habeas corpus* is not to determine the guilt or innocence of the prisoner. The only issue which it presents is whether or not the prisoner is restrained of his liberty by due process of law'.").

Rather, Reedy must rely upon the "body of our *habeas* jurisprudence [which] makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a *habeas* petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. at 404. His claim of innocence is, constitutionally, not an end in itself, but the means by which to achieve an end. Only by meeting his burden on his actual innocence claim can he evade the bar of the statute of limitations (and any other procedural bars), and have his other constitutional claims, his competency-related claims, considered by the court. Since the Virginia Supreme Court has not adopted a standard of review for such a "gateway" actual innocence claim, I will borrow one from the federal courts.

I will apply the standard that would be used in federal court for someone who, like Reedy, claims to be innocent of the crime for which he was sentenced. He must prove that, in light of new evidence, it is more likely than not that no reasonable juror would vote to convict. *Schlup v. Delo*, 513 U.S. at 327 (1995); *see Calderon v. Thompson*, 523 U.S. 538, 559-60, 140 L. Ed. 2d 728, 118 S. Ct. 1489 (1998). Like the plaintiff in a run-of-the-mill civil case, Reedy must prove his claim only by the greater weight of the evidence — but what he must prove is substantial: that it is probable that, after considering the evidence presented in support of his *habeas* petition, "no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S.

at 327; *see Nolan v. Peyton*, 208 Va. 109, 112, 155 S.E.2d 318 (1967) (*habeas* petitioner bears burden of proving claim by preponderance of evidence).

When Reedy was tried, the Commonwealth bore the burden of overcoming the presumption of innocence and proving him guilty beyond a reasonable doubt. There can be no question that now, when he seeks post-conviction relief, the burden of proof properly belongs to Reedy, not the Commonwealth.

> Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. *Cf. Ross v. Moffitt*, 417 U.S. 600, 610, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974) ("The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt"). Here, it is not disputed that the State met its burden of proving at trial that petitioner was guilty ... beyond a reasonable doubt. Thus, in the eyes of the law, petitioner does not come before the Court as one who is "innocent," but, on the contrary, as one who has been convicted by due process of law of two brutal murders.

*Hererra v. Collins*, 506 U.S. at 400. Nor, when the issue is "whether a fairly convicted and therefore legally guilty person" "who, refusing to accept the jury's verdict, demands a hearing in which to have his culpability determined once again," *id.* at 419-20 (O'Connor, J., concurring), is it enough, more than ten years after trial, for him simply to produce evidence that could have been weighed by the jury and which might have affected the jury's verdict. *Id.* at 418 (opinion of the Court).

"'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. at 623. The "claim of actual innocence must be based on *reliable evidence* not presented at trial," *Calderone*, 523 U.S. at 559 (citations omitted and emphasis added), which could include evidence that was erroneously excluded at trial or that only became available after trial. *See Schlup*, 513 U.S. 328.

II. These facts were proven in 1988, and are not contested in this case.

> Shortly after 6:00 a.m. on August 10, 1987, fire broke out at the residence of Reedy, his four year old daughter, and two year old son. The children died of carbon monoxide poisoning due to smoke

inhalation, but Reedy escaped with burns, lacerations, and smoke inhalation injury. Deputy Roanoke Fire Marshal David Rickman, who investigated the fire, testified that the fire was intentionally caused by the pouring and igniting of gasoline on the back porch and kitchen area of the house. ... A physician who treated Reedy testified that, because of the irregularity of burn patterns on Reedy's body, Reedy's burns were not caused by superheated air, but were caused by direct flame.

Reedy, who was separated from his wife, had threatened several times, when he was distraught or had been drinking, to burn his house down with his children and himself in it rather than to allow his wife to obtain the children's custody. The evening before the fire, he had an argument with his girlfriend. As a result of the argument, the girlfriend left Reedy's house with her belongings. Within hours before the fire, Reedy made two trips by taxi to his girlfriend's house in an effort to get her to return to his house. Reedy had been drinking.

After the fire started, Reedy told a neighbor that his children were not in the burning house but were at his girlfriend's house. Therefore, no one attempted to rescue the children. However, before being taken to the hospital, Reedy told a neighbor that the children were in the house. Then, both children were located in the house, dead from carbon monoxide inhalation. The daughter was at the top of the stairs. The son was found in a second floor bedroom with the door tied shut from the outside.

*Reedy v. Commonwealth*, 9 Va. App. at 388. Reedy asserts that "new evidence" points to Tina Dillon Reedy Wheeler ("Tina"), the children's mother and his former wife, as the person who set the fire. Of the fifteen witnesses Reedy called, four offered evidence to support this theory.

Helen Thornhill was Reedy's neighbor. She testified that on the morning of the fatal fire, she was on her front porch, facing Reedy's house. After firefighters already were at work, she saw a small red car parked in an alley, in a position from which a person in the car could have seen the Reedy house without being seen. The car sped off. She did not see its occupant or occupants.

Reedy's mother, Geraldine Wheeler, testified that at around the time of the fire, Tina drove a red car.

Roanoke Police Sgt. A. S. Smith was the robbery-homicide division detective sergeant in 1987. He testified that in 1998 or 1999, he had reviewed the police department's file in the Reedy arson-homicide case and had seen an offense report prepared by Officer Luke about a complaint Davey Reedy made

on August 2, 1987, eight days before the fire. Based on his review of that report, Sgt. Smith testified, he had told *The Roanoke Times* in 1998 or 1999 that Tina was driving a red car on August 2, 1987. He also testified that Officer Luke had made a "supplemental inquiry" to Tina, which Sgt. Smith had reviewed. Based on that, he said, he had told the newspaper that Tina was driving a red Gremlin on August 2, 1987. (The Attorney General notes that the police report, offered in evidence in this case, does not show the color of the vehicle.) The Gremlin, manufactured by American Motors Corporation from 1970 through 1978, was a subcompact car.

Reedy's friend and babysitter, Ruby Entsminger testified to these things. On August 8, 1987, two days before the fire, she had come to Reedy's home to babysit. She was inside the home with Reedy and his children when she saw Tina (whom she did not then know) coming up the hill toward the house. Reedy told Ms. Entsminger to stay inside. He went outside, and he and his estranged wife had a heated argument. Tina told Reedy that "just because you have that house doesn't give you the right to have the kids. They are my kids, too. I want to see them." Reedy refused to allow her to see her children. "And she wanted to know if anybody was in the house because at that time I turned up the radio. ... And Davey told her that it is not what you think." Ms. Entsminger heard something which she assumed was a rock hit the house, heard Reedy again refuse Tina's demand to see the children, and heard Tina declare that, "If I don't have the kids, you know, you won't either, and I will see to it." After the fire, and outside of the funeral home from which her children were to be buried, Tina (who was smoking marijuana and drinking beer) expressed bitterness toward Reedy, said "that it was all meant for Davey," and stated that she should turn her children's coffins over and take their pictures away to demonstrate that they were her children too.

Ruby Entsminger also testified that on the morning of the fire, as she passed through Reedy's normally immaculate back yard, she saw a white jug, disarray in the trees, and something similar to service station paper towels. (The trial jury heard testimony about this jug. Neither Ms. Entsminger nor anyone else connected this jug to Tina.)

All of this evidence was available to Reedy at the time of trial.

According to the testimony at the plenary hearing, Reedy and his estranged spouse were close companions at and before his trial. She attended strategy sessions with him at his lawyer's office. He was on bond during the trial and, though his lawyer, Terry N. Grimes, counseled him about the perils of being "on camera" with Tina during the trial, Reedy and Tina were constantly together outside of the courtroom.

Before the trial, Reedy and his lawyer discussed the possibility of "pointing the finger" at Tina and the possibility of calling her as a defense witness. Grimes, who represented Reedy at trial and in his direct appeal, testified (without being asked to go further into detail and without the court's being asked to rule on Ms. Bondurant's request that Grimes not reveal attorney-client communications) that he had advised against calling Tina. He testified that, in his judgment at the time, Tina's testimony would have increased the likelihood of Reedy receiving a death sentence. When he addressed the jury, the record shows, Grimes argued strongly that evidence pointing to Tina should help jurors have reasonable doubt about Reedy's guilt.

Retired Roanoke police detective Alvin Dudley was the lead investigator in the arson-homicide case. He testified at the evidentiary hearing that Tina had been considered a prime suspect until the police concluded that she had a sound alibi. While Reedy questions the intensity with which the police investigated her alibi, he has not presented any evidence that the alibi was false.

Tina did not testify, either at the trial or at the plenary hearing. Though he testified at his criminal trial, Reedy did not take the stand in this case. To demonstrate Tina's guilt, he seems to construct a syllogism with four major points:

At the time of the fire, Tina and Reedy were estranged, he had their children, and she felt animosity toward him.

Another woman was inside the Reedy home with the children when Reedy refused to allow Tina to see them. When she then asked if anyone was inside, he told her "it's not what you think." Moments later, she angrily hurled something against the house and told him that she would see to it that, if she could not have their children, neither could he.

On the day that her children were buried, Tina was bitter, angry, resentful, rude, and intoxicated. (Evidence in this case and at the criminal trial suggests that intoxication was a familiar state, both to Tina and to her estranged husband, in 1987.)

Tina drove a small red car. On the morning of the fire, a small red car was seen speeding away from an alley near the Reedy home while firefighting efforts were underway.

Thus it is demonstrated — *Q.E.D.* — Reedy argues, that Tina Dillon Reedy Wheeler set the fatal fire. Neither these facts nor this reasoning persuades me that twelve reasonable jurors would more likely than not find Reedy not guilty.

III. The Court of Appeals noted that "as circumstantial evidence that Reedy started the fire, the Commonwealth relied on evidence that Reedy's clothing contained traces of gasoline." *Reedy v. Commonwealth,* 9 Va. App. at

387. In this case, Reedy presented the testimony of Dr. David Stafford, a professor of pathology, crime laboratory director, and expert in gas chromatography and trace analysis. Dr. Stafford criticized the methods employed by Amy Lawrence, the state laboratory "trace analyst" who testified for the Commonwealth at Reedy's trial.

Ms. Lawrence used gas chromatography to analyze samples of Reedy's clothing. She compared the chromatograms (the pattern of separated substances she obtained through chromatography) from Reedy's clothes with a "gasoline standard," and concluded that Reedy's T-shirt and underpants showed the presence of gasoline. Dr. Stafford was critical of her use of a "raw gasoline standard" for this comparison. An "evaporated gasoline standard," he testified, would have been preferable. He also opined that, in 1987, better tests and test protocols were available in Virginia than those Ms. Lawrence used.

Dr. Stafford testified that he had not personally examined the evidence, had not conducted any tests in this case, and had not reviewed Lawrence's files. He had read her trial testimony, the fire department investigative report, and a written report about the samples submitted by the fire department. While he testified that he could not tell from the trial transcript that Lawrence had performed a particular numerical analysis, he also testified that, except by inferences he drew from her testimony, he did not know what tests she had performed.

Dr. Stafford admitted that his own analysis of the chromatograms was inconclusive. He testified that he could not say, to a reasonable degree of professional probability, that Lawrence's tests were wrong in identifying gasoline in Reedy's clothing. If Lawrence was correct about the presence of gasoline in Reedy's clothing, Dr. Stafford testified, it was highly unlikely that the gasoline could have been "transferred" onto the clothes by the fire.

*Satcher v. Pruett*, 126 F.3d 561, 570 (4th Cir.), *cert. denied*, 522 U.S. 1010, 118 S. Ct. 595, 139 L. Ed. 2d 431 (1997), is apposite. In an Arlington County trial in which Satcher was convicted of rape, robbery, and capital murder, the Commonwealth introduced evidence that DNA from the victim's body and clothing matched Satcher's DNA. *Id.* at 564. Seeking *habeas* in federal court, he produced evidence that he had had a DNA sample from the victim analyzed by a different laboratory, with results that were slightly different from those obtained in the Commonwealth's pretrial analysis. This evidence "he maintained proves his innocence or at least allows him to raise certain claims procedurally defaulted in state court." *Id.* at 563. The Fourth Circuit disagreed:

> Satcher's DNA evidence does not show that the Commonwealth's test was wrong. Specifically, it does not show that someone else was the

source of the DNA sample taken from the crime scene. ... None of the experts conclude that Satcher did not contribute the DNA from the sample taken from [the victim] ... Moreover, even discounting Virginia's DNA test altogether, we cannot say that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. It would be a different matter if, as Satcher argues, his new DNA evidence showed that he was definitely not the contributor of the DNA on the swab taken from the crime scene. But his new evidence only suggests, at best, that Virginia's test was inconclusive.

Similarly, Dr. Stafford could neither conclude to a reasonable degree of probability that there was no evaporated gasoline on Reedy's clothing, nor testify to a reasonable degree of probability that Lawrence was wrong. His "new evidence only suggests, at best, that Virginia's test was inconclusive." *Id.* Dr. Stafford is a well-qualified and impressive witness. However, it is impossible for this court to find, based on his inconclusive testimony (with or without the evidence that putatively demonstrates Tina Wheeler's culpability), that no reasonable juror would have voted to convict Reedy. Furthermore, and as Dr. Stafford himself testified, the evidence he presented at the *habeas* hearing could have been presented in 1988.

IV. Over the Attorney General's cogent objections, I granted Reedy's request for evidentiary hearing without ruling about the statute of limitations and without cleaning up the procedural morass created by the filing of Reedy's counseled *habeas corpus* petition in the same suit in which he had filed his *pro se coram nobis* petition. The Supreme Court had not decided the statute of limitations question. This gave me opportunity to grant the hearing request, since I believed it to be in the public interest, as well as Reedy's, for him and his lawyer to have the opportunity to present and preserve evidence that might support his protestations of innocence and his repeated assertions that his former wife, not he, was the criminal agent in the grisly deaths of their children. (In a hearing on October 30, 2000, I said that, "If I decide the statute of limitations question for the Respondent or for the Petitioner, [Reedy's evidence of actual innocence] will have been presented in open court in the light of day ... his witnesses will have the opportunity to present their testimony being examined by Mr. Reedy's attorney and cross-examined by the Respondent's attorney.")

Since his conviction, Reedy has unceasingly proclaimed his innocence. Though he had not previously filed a *habeas corpus* petition, he has filed three

32

dozen or more suits in state and federal court against persons he charged shared responsibility for wrongfully convicting him, wrongfully affirming his convictions, or wrongfully asserting that he is guilty. In the lengthy Sunday feature story that Reedy incorporated in his *coram nobis* petition, *The Roanoke Times* quoted persons who questioned whether, in Reedy's case, an innocent man had been imprisoned. These included a Washington & Lee University law professor, a retired Norfolk detective, and the former gubernatorial pardon attorney who reviewed the case for then-Governor George E. Allen. The newspaper quoted Raphael E. Ferris, the former Assistant Commonwealth's Attorney who had cross-examined Reedy at trial. Among other things, he said: "There's a little voice inside me that says, 'Gee whiz, if somebody protests that long, maybe there's something to it'."

Finality of judgments is a nearly-indispensable element of an efficiently-functioning judicial system. But public confidence in the system's integrity is *the* indispensable element. "Long before there were behavioral scientists ... to frame the concept in words, people sensed from experience and observation that, especially in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 570-70, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980). "To work effectively, it is important that society's criminal process 'satisfy the appearance of justice,' *Offutt v. United States*, 348 U.S. 11, 14, 99 L. Ed. 11, 75 S. Ct. 11 (1954), and the appearance of justice can best be provided by allowing people to observe it." *Id.* at 472. The public must believe that "the business of courts is justice," as Jim Carrigan, then a member of the Colorado Supreme Court, and later a federal district judge, said in 1977. *Los Angeles Herald-Examiner*, August 3, 1977, quoted in Frost-Knappman and Shrager, *The Quotable Lawyer* (rev. ed. 1998) at 37. The signal importance of public confidence in the judiciary is noted in the Preamble, and in Canons 1 and 2, of the *Canons of Judicial Conduct for the State of Virginia*.

The common law recognized a duty to "ensure that all evidence tending to aid in ascertaining the truth is laid before the court...." *State v. Rasmussen*, 225 Conn. 55, 621 A.2d 728 (1993). This court has given Reedy the opportunity to do that. He has failed to produce evidence that — considered separately, and considered in the aggregate — might even "tend" to persuade one to believe that "the truth" is that he is innocent. His evidence fails to persuade this court that it is more likely than not that no reasonable juror would vote to convict. There is no reasonable probability that with this new evidence "no reasonable juror would have found him guilty beyond a reasonable doubt." It is also true, of course, that very little of the "new

evidence" is, in truth, new. Reedy has failed to establish a gateway through which he may assert his procedurally barred constitutional claims. He has had the opportunity to present this evidence in open court, subject not only to the test of cross-examination and to scrutiny in this court and in what his lawyer characterized in a letter dated January 14, 2002, as "the certain appeal of this case by either party," but also to reports in the public press and preservation in the historical record. The testimony and the arguments of counsel will be available to Reedy to offer in support of any future petition for executive clemency review.

Even since the evidence was submitted and the case argued — and again over the Attorney General's well-taken objections — Reedy's attorney has continued to tender proffers of "evidence" against Tina Wheeler.

The fact that, until March 1, the Supreme Court had not decided the statute of limitations question gave me at least a colorable basis to keep the case in the breast of this court, giving Reedy's lawyer the opportunity to find something which would support the assertion that Reedy is, genuinely, innocent, and allow me to exercise my discretion to reopen the evidence. Of course Ms. Bondurant, despite her ardor in her client's cause, never asked me to do so. I knew, however, that, based upon the evidence I had heard, I could not rule in Reedy's favor, and therefore that by deferring the decision, I was not keeping in prison a man who otherwise would be free.

Preserving the warden's objections, I will discuss Reedy's post-argument proffers. I find that nothing submitted comes close to being — or even to suggesting the existence of — "reliable evidence [of Reedy's actual, factual innocence] not presented at trial." *Calderone*, 523 U.S. at 559.

Reedy's lawyer could not procure the presence of Tamberia A. Andrews for the evidentiary hearing. (She was facing serious criminal charges in Bedford County, and her lawyer had advised her against taking the witness stand in Roanoke. Ms. Bondurant now reports that Ms. Andrews has entered a plea of guilty or no contest to second degree murder in Bedford and that her sentencing is scheduled for April 30, 2002.)

Ms. Andrews signed an affidavit in which she swore that she lived with Tina and her consort, Skid Wheeler, in the summer of 1988 or 1989; she spent an evening drinking with them; Tina showed her pictures of the children, told her how they died, and "stated, laughing, that [Reedy] 'was pulling life for burning the two kids'," and that "she told him 'she'd get him one way or another'." Ms. Andrews also stated that Skid Wheeler had told her that five gallons of gasoline had been poured through the window of the Reedy home. She averred that, since the summer in which they had lived together, Tina had threatened to "get" her.

Notwithstanding the warden's objection to consideration of the affidavit, I will assume that Tamberia Andrews would, if given the opportunity, testify in the courtroom to the same things that she said under oath in her affidavit. Her testimony does not show that Reedy is innocent of the crime for which he is "pulling life." She does not state that Tina confessed to "burning the two kids," and one would have to strain badly to draw such an inference from what she did say. Her proffered evidence has no value.

Reedy's lawyer also has proffered evidence about two other fires in which close relatives of Tina perished. In 1980, seven years before the Reedy children were killed in a fire of obvious incendiary origin, Reginald Lynn Austin died in a residential trailer fire in Botetourt County. And, in 1995, eight years after the children's death, and while Reedy was in prison, Doris Faye Niday Dillon died in a house fire that destroyed her rented home in Roanoke. According to representations of counsel, which I accept, Doris Dillon was Tina's mother, and Reginald Austin was Tina's eighteen-year-old husband.

The argument that Reedy's lawyer constructs about these three fires was famously expressed by the archvillain in Ian Fleming's novel *Goldfinger*:

> He said, "Mr. Bond, they have a saying in Chicago: 'Once is happenstance. Twice is coincidence. The third time is enemy action'."

Ian Fleming, *Goldfinger* at 123 (New York: Signet Books, 1960). In a case Reedy cites, the Fourth Circuit more prosaically referred to this as "the doctrine of chances."

> That doctrine posits that the more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous.... *See Wigmore on Evidence* § 302, at 246 (Chadbourne rev. 1979).

*Westfield Ins. Co. v. Harris*, 134 F.3d 608, 615 (4th Cir. 1998).[3] *See* S. E. Fienberg and D. H. Kaye, "Legal and Statistical Aspects of Some Mysterious

---

[3] The question in *Westfield* was whether a fire insurance company was obligated to pay for fire losses. The company sought to produce evidence of seven previous fire claims by the same claimant. The trial "court decided to exclude all such evidence and to preclude any reference to it, explaining that, while the evidence was 'clearly' relevant, its probative value was substantially outweighed by the danger of 'unfair prejudice'.... In making its ruling, however, the court failed to explain how, if the evidence was relevant, it was prejudicial in any way other than by being highly

Clusters," 154 *Journal of the Royal Statistical Society* 61 (1991), www.law.asu.edu/HomePages/Kaye/pubs/evid/clusters91JRSS.htm; *cf.* Kaye, "Quantifying Probative Value," 66 Boston Univ. L. J. 761 (1986), www.law.asu.edu/HomePages/Kaye/pubs/evid/PV-BU-86.htm.

Even as he attempts to tar Tina with the fact that other relatives died in other fires, however, Reedy proffers evidence that demonstrates the folly of attempting to do so.

He submitted an affidavit from B. Reid Kelly, retired Sheriff of Botetourt County, who swore to the following. In 1980, Sheriff Kelly was an investigator with the Sheriff's Department. He investigated the fire in which Reginald Austin died. The Sheriff's Department concluded that the fire was accidental. Neither he nor, to the best of his knowledge, anyone else, interviewed Tina about the fire.

He also submitted an affidavit from the acting Fire Marshal of the City of Roanoke, to which is attached the Fire Marshal's "Fire Incident Report" about the fire in which Tina's mother died. According to the report, Mrs. Dillon was asleep when the fire began. Her son, Tony Dillon, age 27, who was not on the scene when the fire broke out, received a cut while trying to rescue his mother. The Fire Marshal who investigated the incident concluded that the fire was caused by electricity. He reported that he found nothing to indicate any other cause and that family members had reported that they had been having problems with electrical breakers tripping. Tina is not mentioned in the report.

When Reedy's children were killed, investigators immediately saw evidence that the fire was of incendiary nature. These affidavits demonstrate that, though officials also investigated the other two fires, they saw no evidence of incendiary origin. "Where a building is burned, the presumption is that the fire was caused by accident rather than by the act of the accused accompanied by a deliberate intent." *Poulous v. Commonwealth*, 174 Va. 495, 500 S.E.2d 666 (1940) (citations omitted). Reedy's proffered evidence supports the presumption that the other two fires were caused by accident; it seriously undermines any suspicion that Tina was criminally culpable for those fires. " 'The rule in criminal cases is that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, avails nothing unless the *corpus delicti*, the fact that the crime has been actually perpetrated, be first established. So long as the least doubt exists as to the act, there can be no certainty as to the criminal agent'." *Id., accord, Lew v. Commonwealth*, 20 Va. App. 353, 355, 457 S.E.2d 392 (1995).

---

probative." This, the appellate court said, was error. *Id.* at 613-14. The exclusion of other testimony also was error, mandating reversal. *Id.*

Notwithstanding the "doctrine of chances," Reedy's proffered evidence affirmatively establishes that it is *unlikely* that a "crime [was] actually perpetrated" in the deaths of Tina's mother and Reginald Austin. The argument also, in my view, suffers from the logical fallacy known as "*post hoc ergo propter hoc*" ("after this therefore because of this"), the assumption that because one thing follows another, the second thing was caused by the first.

Evidence that Tina's mother died in a 1995 fire and that Tina's first husband died in a 1980 fire would be "incompetent and inadmissible for the purpose of showing the commission of the particular crime" by her, or "for the purpose of showing that [Tina] was likely to commit the crime." *Guill v. Commonwealth*, 255 Va. 134, 139, 495 S.E.2d 489, 491-92 (1998) (citations omitted); *see also, Scates v. Commonwealth*, 262 Va. 757, 758-60, 553 S.E.2d 756 (2001). This is not evidence of Reedy's factual innocence.

In Instruction No. 2 at Reedy's trial, the jury was told, among other things and without objection, that "suspicion or probability of guilt, however strong is not sufficient. ... You shall not speculate or go outside the evidence to consider what you think might have taken place. ... You must limit your consideration to the evidence introduced, and you are not to go outside the evidence to hunt up doubts, nor must you entertain doubts which are speculative or conjectural...." It seems to me that to tell the trier of fact that, in 1980 and 1995, relatives of Tina died in residential fires in which arson was not suspected is to invite nothing *but* speculation and conjecture.

I cannot find it likely that, if presented with this information (assuming that it was admitted), no reasonable juror would have voted to convict.

### Competency-Related Claims

Reedy's substantive and procedural claims about his competency are interwoven in his claims about his trail lawyer's shortcomings with regard to competency issues.

The "claim of 'actual innocence'," it will be remembered, is a "gateway through which [Reedy] must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. at 404. Reedy's multifaceted competency claim is the "otherwise barred constitutional claim" that he makes in this case. As discussed above, he has not met his burden of showing actual innocence. The *habeas* claim is barred by the statute of limitations. As a general, and salutary, proposition, a court should decide a case on the narrowest possible grounds. I nevertheless perceive that there are good reasons to discuss these competency-related claims.

As with the question of innocence, I am of opinion that the public interest is much better served by discussion of the merits of Reedy's competency-related claims than by curt dismissal on a procedural basis. Were I to determine from the evidence that he was convicted when, constitutionally, he should not have been tried, then I — and thereafter the Supreme Court — could analyze whether procedural bars can be bypassed. It is perhaps for similar reasons that, as noted earlier, when the Supreme Court of Virginia reviews criminal cases in which *coram nobis* claims are made, it tends to discuss the substance of the claim, even when it concludes that the writ does not lie.

At common law, the writ of *coram nobis* addressed organic errors in the trial court. The essence of Reedy's argument is that he was not competent to be tried. Trying, convicting, and sentencing an individual when the Constitution prohibits his trial might seem as much an organic error as entering judgment against a minor, although *Blowe v. Peyton*, 208 Va. at 73-74, precludes the use of this writ to reach anything other than clerical errors or errors in fact. In the thirty-five years since *Blowe* was decided, some courts have found *coram nobis* to be an amazingly elastic writ, suitable for employment when there is no other vehicle through which to grant relief. While I am bound by the rules of *stare decisis* to follow *Blowe*, the Commonwealth's court of last resort has the right to determine that *Blowe* is inapposite or to be limited or distinguished. Considerations of judicial economy and of efficiency and economy for the parties auger in favor of the trial court's discussing the merits of this claim at this time.

Conviction of a person while he is legally incompetent violates his constitutional right to due process of law. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966); *Beck v. Angelone*, 261 F.3d 377, 387 (4th Cir.), *cert. denied*, 151 L. Ed. 2d 321, 127 Sup. Ct. 417 (2001). "The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him'." *Godinez v. Moran*, 509 U.S. 389, 396, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 2 L. Ed. 2d 824, 80 S. Ct. 788 (1960)); *Beck v. Angelone*, 261 F.3d at 387. Today, as in 1988, Code § 19.2-169.1(A) provides that a defendant is incompetent to stand trial if he "lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." "The party alleging that the defendant is incompetent shall bear the burden of proving by a preponderance of the evidence the defendant's incompetency." Code § 19.2-169.1(E).

In a recent opinion that summarized current case law, the Fourth Circuit noted that a trial judge cannot ignore facts raising a "bona fide doubt" about the criminal defendant's competency to stand trial and must be alert during trial to anything that would suggest loss of competency. Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," " 'not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'... Similarly, 'neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.' 'Moreover, the fact that the petitioner has been treated with anti-psychotic drugs does not *per se* render him incompetent to stand trial'." *Beck v. Angelone*, 261 F.3d at 387 (citations omitted). A defendant can suffer from a "delusional disorder of a persecutory type," and have "paranoid delusions about how evidence is being manufactured against him," yet still be competent to be tried and able to assist one's lawyers, even if there is disagreement about the "focus of the defense." *Bramblett v. Commonwealth*, 257 Va. 263, 273, 513 S.E.2d 400 (1999).

Reedy introduced evidence that, when tested in 1971, he had a relatively low "intelligence quotient" (IQ) of around 74 (placing him in the "borderline intellectual functioning" category according to the *Diagnostic and Statistical Manual III-R* of the American Psychiatric Association, which was the manual in use in 1987). He left school when he was in the seventh grade. Approximately five years before the fatal fire, he had twice been admitted to Roanoke Memorial Rehabilitation Center for mental health treatment and was discharged on both occasions with diagnoses of borderline personality disorder, alcohol dependence, and clinical depression. He was not psychotic, according to the records of those admissions, and denied suicidal ideations.

In records created after the fire and before the trial, Reedy was described as grieving, depressed, and under stress, but suffering from no formal thought disorder. When he was admitted to the hospital after the fire, he was severely burned, and for some time suffered great physical pain as a result of his burns.

Before and after the fire, Reedy was under the care of Dr. Mukesh Patel, a psychiatrist, and Deborah Smith, a licensed social worker, who worked with Dr. Patel. Both testified in this case. According to their records and recollections, Reedy was emotional after the fire; he expressed tremendous grief over his children's deaths and anger over his criminal charges. Neither Dr. Patel nor Ms. Smith rendered an opinion — in 1988 or at the evidentiary hearing — that, before or during trial, Reedy suffered from any delusions or hallucinations or that he was overtly psychotic. Ms. Smith opined that Reedy

"lacked the emotional energy and cognitive strength to devote to defending himself at trial." She testified that, on January 19, 1988, a little more than three weeks before trial, Reedy told her that he was afraid that he might lose his temper in court, or "just start crying and he wouldn't be able to contain that." Ms. Smith testified at the plenary hearing that she thought Reedy around the time of the trial "was trying to hold himself together as best he could. So he didn't want to lose it as far as the anger goes or the grief goes."

In office progress notes that he made on December 4, 1987, two months before the trial, Dr. Patel wrote that "I could strongly suggest that emotionally I don't think he is ready to stand trial. He probably understands the nature of the charges but because of his mixed emotional status I don't think that he can fully cooperate with his lawyer to defend him." In a letter to attorney Grimes, dated December 9, Dr. Patel said that "I could definitely see him as having lots of mixed emotions about various issues which probably could limit his capacity" and "in my opinion he does not know what is in his defense or what is hurting to him at the present time." Dr. Patel's letter said that he had not assessed Reedy's competency to stand trial. "My limited therapeutic involvement with Mr. Reedy," he wrote, "was heavily geared to discuss and evaluate him for his emotional stabilities at the present time for his struggle with his potential substance abuse problem and for his mixed emotions about the whole incident of burns, charges, and legal proceedings." Similarly, in 2001, in testimony at the *habeas* hearing, Dr. Patel described Reedy as having appeared "very liable, rather fragile," "very distressed, depressed, clinically." "I didn't feel that he had a good grasp of what actually [was] going on in the whole sense because he was fluctuating and shifting so much," Dr. Patel recalled.

On December 7, 1987, Reedy's lawyer moved to continue the trial (then set in December), and for a competency evaluation pursuant to Code § 19.2-169.1, which provides for such an evaluation if "there is probable cause to believe that the defendant lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." At the evidentiary hearing, Dr. Patel testified that he could not have performed an objective evaluation of Reedy's legal competency, because, in his view, as Reedy's treating psychiatrist, he also was the patient's "advocate."

Dr. Patel, a psychiatrist, was qualified by statute to examine Reedy and render an opinion under § 19.2-169.1. Ms. Smith, a clinical worker, was not. There is no evidence that either of them held the opinion, to a reasonable degree of professional probability, that, before or during his trial, Reedy was incompetent under the standards of § 19.2-169.1 and *Dusky v. United States*.

I granted the motions, continued the trial, and appointed Dr. Lois Saute, a licensed clinical psychologist, to evaluate Reedy's competency to stand trial

and assist his attorney in the defense of the case. Dr. Saute had been specially trained in forensic competency evaluations and, by the time that she performed this evaluation, had had a great deal of experience in the field. In a written report dated December 28, Dr. Saute stated that:

> [Reedy] was appropriately concerned with the seriousness of the charges against him … was fully oriented to time, person, place, and situation. There was no indication of disturbances of perception such as hallucinations or delusions. … He is aware that he could get two life sentences or the death penalty, if convicted. He evidenced a reasonable comprehension of available legal strategies and defenses and a good understanding of court procedures and of the roles of various courtroom personnel. He expressed confidence in his attorney and appears capable of forming a good working relationship with him. He evidences a capacity to testify relevantly and is motivated to help himself in regard to this legal situation.

At the plenary hearing, Dr. Saute testified that "I appreciated Mr. Reedy's need to grieve the death of his children but felt unable to find him incompetent to stand trial because of the things he was able to do during my meeting with him." In response to questions at that hearing, Dr. Saute testified that, in her opinion to a reasonable of professional probability, at the time of the evaluation, Reedy had substantial capacity to understand the proceedings against him; in fact understood the proceedings against him; and had substantial capacity to assist his trial counsel in his own defense.

In her written competency evaluation, Dr. Saute warned of the likelihood that Reedy would experience strong emotional reactions to some of the testimony and proceedings at his trial, which would "probably disrupt his ability to concentrate on the proceedings and keep a sequential account of the events of the trial in mind." Neither in that report nor in her testimony thirteen years later did Dr. Saute suggest that there was any indication that these strong emotions likely would — or likely did — render Reedy unable to meet the requirements of *Dusky*.

Following receipt of the report, no formal competency hearing was held, nor, apparently, did I make an explicit or formal finding that Reedy was competent. Code § 19.2-169.1(E) provides that:

> After receiving the report [of the competency evaluation], the court shall promptly determine whether the defendant is competent to stand trial. *A hearing on the defendant's competency is not required unless*

*one is requested by the attorney for the Commonwealth or the attorney for the defendant, or unless the court has reasonable cause to believe the defendant will be hospitalized [for restoration of competency after a finding of incompetency] under § 19.2-169.2.* If a hearing is held, the party alleging that the defendant is incompetent shall bear the burden of proving by a preponderance of the evidence the defendant's incompetency. The defendant shall have the right to notice of the hearing, the right to counsel at the hearing and the right to personally participate in and introduce evidence at the hearing.

(Emphasis added.) No hearing was requested by counsel, and nothing in the report or otherwise suggested the need for competency restoration — much less, need to be hospitalized for restoration of competency. By proceeding with the trial, not holding a competency hearing, not proceeding in the manner specified by § 19.2-169.2 (which details what must be done when a defendant is found incompetent), and by explicitly accepting the defendant's pleas of not guilty, I necessarily — albeit *sub silentio* — determined that Reedy was competent to stand trial. Dr. Saute's report furnished the basis for that determination, and nothing to contradict Dr. Saute's conclusions was ever presented to the court. Had a formal hearing been held, then, under § 19.2-169.1(E), Reedy would have borne the burdens of production and persuasion, the burden of producing evidence to persuade me, by the greater weight of the evidence, that he was not competent to stand trial. Even at this late date, he has not produced such evidence.

Reedy asserts that he lacked sufficient recall of the events surrounding the deaths of this children. "The fact that the defendant claims to be unable to remember the time period surrounding the alleged offense" however, "shall not, by itself, bar a finding of competency if the defendant otherwise understands the charges against him and can assist in his defense." Code § 19.2-169.1.

He also argues that he might have been suicidal before and during his trial. Deborah Smith, the clinical social worker, testified that "I know he was suicidal at times or he voiced suicidal thoughts," but also testified that "in my presence, Mr. Reedy never voiced any suicidal ideations or appeared suicidal." Her progress notes are bereft of indication that Reedy expressed to her any present intention to do harm to himself. At one meeting, on September 16, 1987, he informed her that he would not harm himself because he wanted to make sure that the "guilty person" would not be "let off." Neither she nor Dr. Patel sought to have Reedy hospitalized to protect him against the possibility of a suicide attempt. Reedy's defense attorney, Terry Grimes, testified that "in my presence,

Mr. Reedy never voiced any suicidal ideations or appeared suicidal." Geraldine Wheeler, Reedy's mother, testified that from time to time, Reedy had expressed suicidal thoughts but that he also stated that he did not want to kill himself because then people would believe he had murdered his children.

The trial began on Monday, February 1, 1988. On Friday, February 5, Reedy said he was ill. He was examined by a paramedic,[4] and taken to a hospital emergency room. Found to be in gastrointestinal distress and with an unusually high liver enzyme reading, he was admitted to the hospital for follow-up and cardiac testing, and the jury was excused until the following Tuesday.

That afternoon, Reedy, who, it will be recalled, was on bond during the trial, left the hospital against medical advice, saying he was going to visit his children's graves, then go home for clothing to take back to the hospital. At a hearing later that afternoon, Reedy apologized for causing concern. Personally and through counsel, he explained that he had not thought that he was "doing anything illegal." I discussed with him his responsibilities while on bond and the risks of voluntarily absenting himself from trial. Assuming that his actions would have furnished a basis for revoking his bond, I did not do so, but instead admonished him, apparently to good effect, to "behave rationally from here on out." (On the same day that doctors had determined that he should be admitted to the hospital, I also, as his lawyer points out, told him that he did not look good.) Reedy's present attorney suggests that my words demonstrated that I should have been aware of a need to stop and reassess the defendant's competency to stand trial.

A flaw in that argument is that there is no evidence that such a need existed. Notwithstanding thorough investigation by Reedy's current lawyer and presentation of testimony from professionals who saw and treated him at the hospital, there is not even a scintilla of evidence that he was not then legally competent. No one who had contact with him before, after, or during his hospital visit presented information or testimony, either in 1988 or during the evidentiary hearings, suggesting concern that his rational and factual understanding of the proceedings against him had diminished or that there was any lessening in his present ability to consult and confer with his lawyer and assist in the defense of this case. *Compare, e.g., Drope*, 420 U.S. 162, 180; *see Burket v. Angelone*, 208 F.3d 172, 192 ("Neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."). As noted above, if Reedy had asserted

---

[4] Reedy's current lawyer noted my circumlocution. Instead of asking the paramedic, a deputy sheriff, if the defendant was malingering or faking, I inquired about possible "psychological involvement."

in 1988 that he was not competent to stand trial, he would have borne the burden of proving his incompetence by the greater weight of the evidence. Code § 19.2-169.1(E). He cannot — ignoring for the moment, questions of procedural bars — bear any lesser burden when he seeks collateral review of his criminal convictions. *See Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1991) (Burden is proof by preponderance that, at time of trial, mental condition precluded defendant "from perceiving accurately, interpreting, and/or responding appropriately to the world around him."); *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001). "One attacking a judgment of conviction in a *habeas corpus* proceeding has the burden of proving by a preponderance of the evidence the allegations contained in his petition." *Nolan v. Peyton*, 208 Va. at 112.

Reedy's mother testified at the *habeas* hearing that, on the night before he went to the hospital, her son had spoken about drinking a bottle of iodine. (The inference to be drawn is that he intended to poison himself.) She testified that she later found an empty bottle of iodine in a trash can located next to his bed. However, if she had any suspicions in 1988 that he had swallowed iodine or that ingestion of anything had caused her son's condition, she did not say so at the time, even to the doctors who were treating him. It also is worthy of at least passing note that, according to a leading authoritative text, the symptoms of iodine poisoning are: "Burning pain in mouth and esophagus, mucous membranes stained brown; laryngeal edema; diarrhea; shock, nephritis, circulatory collapse." *Merck Manual of Diagnosis and Therapy* (17th ed.), § 23, Poisoning, Chapter 307, Poisoning, Table 307-3, "Symptoms and Treatment of Specific Poisons." These are not the symptoms described by Reedy in 1988. Even if one were to assume that Reedy did consume a bottle of iodine, he would still bear the burden of demonstrating that this impaired his ability to understand the proceedings or communicate with his lawyer. The evidence does not show this. Reedy has not shown that his mental condition kept him from accurately perceiving, interpreting, and responding to the world around him and to the lawyer defending him. It also is not self-evident that contemplation of suicide by a man on trial for murdering his own two-year-old and four-year-old children demonstrates legal incompetency.

As noted, Reedy testified on his own behalf at his criminal trial. Grimes, his trial lawyer, testified at the plenary hearing that Reedy had been actively involved in planning and participating in his own defense and that Reedy himself made the decision to testify. Grimes also testified that he perceived that Reedy did well on direct examination, furnishing a substantial amount of detailed information. *See Media v. California*, 505 U.S. 437, 450, 120 L. Ed.

2d 353, 112 S. Ct. 2572 (1992). No one testified to perception that Reedy did not perform well while his own lawyer was questioning him.

Under strenuous cross-examination, however, Reedy lost his composure and beseeched his lawyer to put a halt to the Commonwealth's Attorney's questioning. As Dr. Saute had warned, Reedy had strong emotional reactions, which came to the fore during cross-examination. He did not, however, say anything inculpatory or — it seems to me now, as it did during the trial — inconsistent with the theory of the defense. As the Attorney General notes, even while emotionally reacting to the cross-examiner, Reedy demonstrated a rational understanding that he was not "performing" well and that his own attorney was the person to whom to turn for help. Neither by itself nor in combination with other evidence does his behavior on the witness stand prove, or tend to prove, that he was legally incompetent.

Counsel for Reedy argues that "breaking down" during cross-examination is evidence of incompetence to stand trial. I disagree. "Even if one does not completely agree with Wigmore's assertion that cross-examination is 'beyond any doubt the greatest legal engine ever invented for the discovery of truth,' one must admit that in the Anglo-American legal system cross-examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate." *United States v. Salerno*, 505 U.S. 317, 328, 112 S. Ct. 2503, 120 L. Ed. 2d 255 (1992) (Stevens, J. dissenting); *see* 5 J. Wigmore, *Evidence*, § 1367, p. 32 (J. Chadbourn rev. 1974). The jury was entitled to take the defendant's demeanor into account in judging his credibility when he took the witness stand. One obvious purpose of the cross-examiner was to attempt to lead the jury to conclude that, rather than unable to remember, Reedy was purposefully evasive; the jury was entitled to consider whether that was so. The Assistant Commonwealth's Attorney asked questions, as he was entitled to, from which jurors could reach conclusions, as they were entitled to, about whether, for example, Reedy's grieving was motivated, in part or in whole, by guilty knowledge or culpability. There is no warrant for an assumption that when a witness being cross-examined is evasive, angry, confused, or uncomfortable, he is legally incompetent.

Reedy offers school and medical records and testimony that, he argues, support the proposition that further inquiry should have been made into his competency in 1988. This argument requires uncritical acceptance of the truthfulness of nearly recorded utterances of the defendant. It also requires, at this late date and in this post-conviction proceeding, that the trier of fact draw every inference most strongly in the defendant's favor (rather than in favor of the Commonwealth, in whose favor the jury found). The court, in truth, would have to do more than simply draw inferences in Reedy's favor, since no expert

testified that, with the addition of any or all of this information, the witness would be able to opine that Reedy was, at any phase of the proceedings, incompetent.

It is true, as the warden has argued from the beginning of this case, that a prisoner's claim that he was incompetent to stand trial is subject to procedural default. *Smith v. Moore*, 137 F.3d 808, 819 (4th Cir. 1997), *cert. denied*, 525 U.S. 86, 142 L. Ed. 2d 163, 119 S. Ct. 199 (1998); *Burket v. Angelone*, 208 F.3d at 191. Reedy has not shown that he could avoid a finding of procedural default under *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680; 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied sub nom. Parrigan v. Paderick*, 419 U.S. 1108, 42 L. Ed. 2d 804, 95 S. Ct. 780 (1975). *See Noble v. Barnett*, 24 F.3d 582, 586 (4th Cir. 1994).

More to the point, however, Reedy has failed completely in his effort to prove his assertions about the adequacy of Grimes' representation. A defendant who claims ineffective assistance of counsel must prove that counsel's performance was deficient (that is, not the result of reasonable professional judgment and outside the wide range of professionally competent assistance); and that, as a result, he actually was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 690 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. *See Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *Moore v. Hinkle*, 259 Va. 479, 487, 527 S.E.2d 419 (2000). A court considering an ineffective assistance claim does not have to "determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant. ... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

The burden is upon Reedy to show that there is a "reasonable probability" that, but for his lawyer's errors — assuming that there were errors — the result of the proceeding would have been different. *Id*. at 694; *see also Moore v. Hinkle*, 259 Va. 479, 490, 527 S.E.2d 419 (2000); *but see Williams v. Warden*, 254 Va. 16, 23, 487 S.E.2d 194 (1997). Reedy argues that Grimes should have checked more thoroughly into Reedy's background, should have made sure that Dr. Patel's and Ms. Smith's medical records were made available to Dr. Saute (although Dr. Saute cannot say whether or not she had those records), that he should have sought a formal competency finding

before, and hearing during, the trial, and that he should have raised the competency issue at the sentencing hearing. However, he has not shown any reasonable probability that, had these actions been taken, he would have been found incompetent to stand trial. As discussed above, he has failed to establish that he was, in fact, legally incompetent. *See Beck v. Angelone*, 261 F.3d at 393 ("the record indisputably demonstrated that Beck was competent at the time of his guilty pleas and at the sentencing phase of his case and, therefore, [Beck] was not prejudiced by counsel's decision not to raise the competency issue."); *Moody v. Johnson*, 139 F.3d 477, 484 (lawyer "could not have been deficient in failing to discover [the petitioner's] alleged incompetence where there has been no showing that [he] was incompetent").

Even if Reedy could meet *Strickland's* prejudice test, he would also have to demonstrate that the Grimes's representation was "so deficient as to fall below the minimum acceptable standard of care and skill which a reasonably competent attorney would exercise under the factual circumstances of the particular case." *Moore v. Hinkle*, 259 Va. at 487-88; see also *Williams v. Warden*, 254 Va. at 23. In deciding an ineffectiveness claim, the reviewing court must judge the reasonableness of the trial counsel's challenged conduct on the facts of the particular case, viewed as of the time of the counsel's conduct. *Strickland*, 466 U.S. at 690.

Reedy's evidence fails on this score, as well. Grimes testified that he never saw any behavior that caused him to seriously doubt Reedy's competency. After communication with Dr. Patel, Grimes prudently and appropriately asked for and obtained a forensic mental health examination under Code § 19.2-169.1. Dr. Saute's report depicted Reedy as an individual competent to stand trial. In foregoing a request for a formal competency hearing, Grimes was not merely relying upon his own lay observations and opinion about Reedy's competency, but upon the fact that the expert appointed by the court to assess the defendant's competency had found him competent. Though Dr. Patel had written to Grimes that Reedy might not be competent to stand trial, the doctor had qualified that opinion by stating that he had not specifically evaluated Reedy for competency. Dr. Saute had. *See, e.g., Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (finding that the petitioner's trial counsel was not ineffective in declining to further investigate or to develop more fully any mental health defenses after having received a report from the petitioner's mental health expert opining that the petitioner was not insane at the time of the offense); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").

There is no evidence that Reedy or his family ever told Grimes about Reedy's prior psychiatric history or of any school or other records which might potentially speak to his competency. Reedy has alleged that Grimes was deficient in his performance for failing to research Reedy's social and psychiatric history. In *Hendricks v. Calderon*, a case with somewhat similar facts, the petitioner's trial counsel provided the defense's mental health experts with "the limited information" in his possession." 70 F.3d at 1037. Neither mental health examiner requested additional background information from the attorney or indicated in their reports that they considered their conclusions to have been based on insufficient information. *Id*. The court noted that "there is no evidence that the conclusions of the experts were tentative, snap judgments, or otherwise based on anything less than a full analysis of complete data." *Id*. Hendricks contended that his lawyer's failure to investigate his social history constituted deficient representation. He argued "that trial counsel had a duty to provide the experts with his client's family social history, even absent any request from the experts [and] that counsel's failure to do so undermines the expert's conclusions to such an extent that they cannot provide an adequate basis on which the attorney could make strategic choices." *Id*. at 1038. The Ninth Circuit found that the attorney had no duty to "acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert." *Id*. (citing *Card v. Dugger*, 911 F.2d 1494, 1512 (11th Cir. 1990) (attorney "was not obligated to track down every record that might possibly relate to [the defendant's] mental health and could affect a diagnosis."); *Bloom v. Vasquez*, 840 F. Supp. 1362, 1370 (C.D. Cal. 1993). With respect to medical history and school records, Reedy has made arguments similar to those advanced in *Hendricks*. The Court's reasoning in *Hendricks* is sound, and its conclusions are apposite to this case.

Dr. Saute was aware that Reedy was seeing or had seen Dr. Patel, but she did not request that Grimes provide her with records from Dr. Patel, nor qualify her report due to lack of this information. Code § 19.2-169.1 states that the defendant must provide to the mental health evaluator "any available psychiatric records and other information that is deemed relevant." Reedy argues that this provision required Grimes to obtain his records from Dr. Patel and Ms. Smith and furnish them to Dr. Saute. There is no support in the evidence for this conclusion, nor — to come full circle — any evidence that failure to do so prejudiced Reedy.

## Conclusion

In summary, the court has found that Reedy's *habeas corpus* petition is barred by the statute of limitations. While actual innocence would permit him to evade that time-bar, Reedy has utterly failed to demonstrate that he is actually innocent, even when I consider evidence to which the warden properly has objected. He has no "new evidence," no material evidence that could not have been employed in 1988. His claims that he was tried and sentenced while incompetent and that his trial lawyer rendered constitutionally inadequate representation on that score are unsupported by evidence, as well as procedurally barred. He has not proven that he was prejudiced by his trial lawyer's acts or omissions. He has shown no error of the sort that might be corrected by writ of *coram nobis*, and he has fallen woefully short of demonstrating the need for *coram nobis* to serve because there is not another way to do justice. He has had the opportunity to demonstrate that he is a victim of injustice. He has not done so.

With vigor and zeal, Reedy's able and dedicated *habeas* counsel set out to vindicate her client. At the end of the day, however, there is precious little substance to back up Reedy's assertions that the Commonwealth must retry or free him. Reedy's claim for relief is not just legally insufficient; it stands unsupported by facts which would impeach the jury's verdict.

The court has granted Reedy's request to file his petition for writ of *habeas corpus* and the amendment thereto as supplements to, rather than replacements for, the petition for writ of *coram nobis* and has considered whether he is entitled to relief through either common law writ. Each petition is denied and dismissed.